1

2

3

4

5

6

7

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUSSELL WILSON, | Case No. 1:20-cv-01753-SKO |
| Plaintiff, | |
| v. | ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| KILOLO KIJAKAZI,<br>Acting Commissioner of Social Security,[1] | |
| Defendant. | (Doc. 1) |
| _____/ | |

## I.      INTRODUCTION

Plaintiff Russell Wilson ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for disability insurance benefits ("DIB") under the Social Security Act (the "Act"). (Doc. 1.)  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

///

---

[1] On July 9, 2021, Kilolo Kijakazi was named Acting Commissioner of the Social Security Administration.  *See* https://www.ssa.gov/history/commissioners.html.  She is therefore substituted as the defendant in this action.  *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in [their] official capacity, be the proper defendant").

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (*See* Doc. 10.)

## II.       BACKGROUND

Plaintiff was born on November 13, 1971, has a college education, and can communicate in English.  (Administrative Record ("AR") 39, 40, 70, 84, 205, 273.)  Plaintiff filed a claim for DIB on January 24, 2018, alleging he became disabled on October 11, 2017, due to frontotemporal dementia, Pick's Disease, C4-C5 disc replacement, frontal lobe executive function control, depression, generalized anxiety disorder, diabetes, constipation, fatigue, dizziness, poor balance, weak grip, muscle spasms, lightheadedness, numbness, pain, sensitivity to chemicals and heat, skin problems, slurred speech, insomnia, weakness, migraines, headaches, mood swings, flashbacks, irritability, and obsessiveness.  (AR 70–71, 84–85, 116, 122, 209, 218, 263, 276.)

### A.       Relevant Evidence of Record[3]

#### 1.       Medical Evidence

In July and August 2017, Plaintiff presented for a diagnostic evaluation by Bradley A. Schuyler, Ph.D. due to concerns about possible attention deficient hyperactivity disorder (ADHD), focus, memory, and facial twitching.  (AR 333–44, 562–64, 573–75, 584–92, 595–603.)  Dr. Schuyler conducted mental status examinations of Plaintiff, and found he had normal appearance, his "mentation" was within normal limited, and he had euthymic mood.  (AR 334, 337, 340, 343, 563, 574, 585, 588, 591, 596, 599, 602.)  Testing by Dr. Schuyler confirmed that he "does not have an attention disorder," but he did have "difficulties with nonverbal reasoning."  (AR 335, 338, 564, 575, 597, 600.)  He was distracted by talking during testing, but was otherwise not impulsive and did not appear hesitant.  (AR 332.)

In October 2017, Plaintiff reported to his family physician Anthony Montana, M.D., that he was having "difficulty with cognitive dysfunction and performing his usual customary work activities because of inability to concentrate focus and have appropriate memory."  (AR 351, 375–76.)  His anxiety and depression were noted to be controlled by medication.  (AR 351, 376.)  Dr. Montana's mental examination of Plaintiff was normal, with normal mood, affect, and behavior.  (AR 352, 377.)  That same month, Plaintiff complained of depression, anxiety, and lack of

---

[3] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

concentration/forgetfulness.  (AR 395, 533.)  He reported taking benzodiazepine "for many years."  (AR 395, 533.)  He was dressed appropriately, well groomed, good hygiene, and cooperative and had a "calm and relaxed" normal gait.  (AR 396, 534.)  Upon mental status examination, the examiner noted Plaintiff spoke slowly and stammered, with difficulty finding words.  (AR 396, 534.)  His mood was noted as "normal and depressed."  (AR 396, 534.)  His affect was normal and thought process was organized, goal directed, and linear.  (AR 396, 534.)  Plaintiff was found to be alert, with both long-term and short-term memory intact, good judgment, good insight, intact reasoning, and full insight.  (AR 396, 534.)

That same month, Plaintiff presented for a follow up appointment with Dr. Schuyler.  (AR 543–46, 549–52.)  Dr. Schuyler's mental status examination of Plaintiff was normal, with euthymic mood.  (AR 544, 550.)  After a discussion of Plaintiff's neuropsychological evaluation testing, Dr. Schuyler concluded that the results "validate the patient's subjective complaints of experiencing difficulties with memory and executive functions."  (AR 545, 551.)

Plaintiff reported having memory problems and "not doing well" in November 2017.  (AR 394, 532.)  He was advised, and understood, that use of benzodiazepine "can cause memory problem[s]."  (AR 394, 532.)  He was observed to be "casually dressed, cooperative, and polite," with coherent and relevant speech.  (AR 394, 532.)  Plaintiff's mood was "flat," with "affect congruent to mood."  (AR 394, 532.)  His cognitive functions were within normal limits.  (AR 394, 532.)  Treatment notes from provider Madhav Suri, M.D. that same month discuss concerns about "frontal lobe lesions."  (AR 579.)  EEG results were normal.  (AR 362–63.)

In December 2017, Plaintiff complained about anger issues since starting a new medication and believed "the SSRI caused mania."  (AR 393, 531.)  He reported obsessive compulsive disorder (OCD) and depression symptoms.  (AR 393, 531.)  His examination results were the same as the previous month.  (AR 393, 531.)  MRI results that month showed "[s]table nonspecific T2/FLAIR hyperintensities," "[n]o acute intercranial abnormality," and mild paranasal sinus disease.  (AR 357, 359.)

In January 2018, Plaintiff presented for a follow up appointment.  (AR 392, 530.)  He reported that Seroquel was "working better" and that his sleep was "good."  (AR 392, 530.)  He

was noted to be "doing well," and his mental status examination results were normal.  (AR 392, 530.)  Plaintiff noted he was "doing better" with good sleep in March 2018.  (AR 529.)  His mental status examination was normal, with normal cognitive functions.  (AR 529.)  Plaintiff was noted to be "doing well."  (AR 529.)  That same month, Dr. Suri noted Plaintiff's anxiety and depression was controlled with medication.  (AR 381–82.)

Plaintiff presented for a psychological assessment by Steven C. Swanson, Ph.D., in March 2018.  (AR 514–19.)  He reported that he was involved in a "dune buggy" club, and enjoyed riding these and dirt-bikes, boating, camping, and going to the beach.  (AR 515.)  Plaintiff reported feeling "okay" and stated he was a "pretty laid-back person most days."  (AR 516.)  During the examination, Dr. Swanson described Plaintiff as "very talkative," friendly, cooperative, and "laughing happily" at times.  (AR 516.)  Plaintiff was able to maintain sufficient attention and concentration on testing during the examination, and had average scores on both intelligence and memory tests.  (AR 516–18.)  His mental and emotional function appeared to fall withing normal limits, with "euthymic to euphoric" mood, full affect, normal thought content and form, and no evidence of delusion.  (AR 516, 518.)

That same month, Plaintiff underwent an independent medical evaluation by Michael M. Bronshvag, M.D.  (AR 553–60.)  Although Plaintiff complained of dementia, Dr. Bronshvag found that Plaintiff's medical records "do not document or demonstrate dementia."  (AR 553, 555–56.)  Dr. Bronshvag found no evidence of any structural brain disease, atrophy, shrinkage, seizures, or dementia.  (AR 558.)  According to Dr. Bronshvag, Plaintiff's "MRI findings are at worst nonspecific and most probably normal.  The absence of any atrophy in the brain parenchyma is incompatible with a demonstrated diagnosis of dementia."  (AR 558.)

Dr. Bronshvag administered the MOCA (Montreal Cognitive Assessment), on which Plaintiff had some omissions, but was fully oriented and was noted with "very precise and articulate memory and insight relevant to the history."  (AR 557.)  Dr. Bronshvag noted that "the probability is that the problem was volitional rather than brain damage."  (AR 557.)  He observed that there

> was clearly a dichotomy between his precisely provided history and his description
> of the difficulties he was having.   To what extent that represents lack of

1  cooperation, or some sort of a psychological problem is a pertinent question I do
2  not answer at this time.  Perhaps it might be most tactful to state that he was fully
   cooperative, but his great concerns flavored the data he provided.

3  (AR 559–60.)

4      Plaintiff presented for treatment with Dwight W. Sievert, M.D. in April 2018.  (AR 528,

5  653–57.)  He complained of "front lobe dysfunction," "mini strokes," memory loss, fretfulness,

6  and irritability, and noted that he was "not doing well." (AR 528, 653, 654.)  His mood was "flat,"

7  but otherwise his mental status examination was normal, including normal cognitive functions.

8  (AR 528, 653.)  Later in the month,  he reported he was "doing well," yet still had depressed effect

9  and obsessive symptoms.  (AR 627, 656.)  Plaintiff was also "doing ok" in May 2018, but

10  "wonder[ed] if he will get worse."  (AR 658.)  In June 2018, Plaintiff reported to Dr. Sievert that

11  he was "doing well" with euthymic mood.  (AR 638, 660.)

12      In August 2018, Plaintiff stated that he was "forgetful," but "no worse than in [the] past."

13  (AR 640.)  He told Dr. Sievert that he "helped out" his aunt and dying uncle in a "nearby city."

14  (AR 640.)  In September 2018, Plaintiff transitioned to Trintellix, a new medication.  (AR 664.)

15  He reported irritability, anxiety, depressed mood, and forgetfulness.  (AR 664.)

16      Plaintiff was noted to be "doing well" and "elated" in October 2018 but with anxiety and

17  "depressed affect and depressed mood." (AR 644, 666.)  Dr. Sievert observed Plaintiff was "doing

18  ok but still down." (AR 644, 666.)

19      In November 2018, Plaintiff was "irritable, fretful and doing so so [sic]."  (AR 646, 668.)

20  He reported feeling "forgetful" and that he "cannot remember things and does not have

21  conversations." (AR 646, 668.)  Dr. Sievert observed Plaintiff was "doing ok" during that visit.

22  (AR 646, 668.)  Later that month, Plaintiff was "doing fairly well" but still anxious and "somewhat

23  depressed."  (AR 648, 670.)  Upon mental status examination by Dr. Sievert, he was observed to

24  be "doing well," appropriately dressed, cooperative, polite, alert, and oriented.  (AR 648, 670.)

25  Plaintiff's speech was coherent and relevant.  (AR 648, 670.)  His mood was normal, with normal

26  orientation and cognitive functions.  (AR 648, 670.)  Dr. Sievert noted Plaintiff was "calm and

27  cooperative," "alert and oriented," and "doing well" in February 2019.  (AR 649, 672.)  His mental

28  status examination was normal, including normal cognitive functions.  (AR 649, 672.)

1   In March 2019, Plaintiff's mood was "generally ok," and he was "doing well," with normal

2   examination results as before.  (AR 650, 674.)  The same was true in May 2019, when Plaintiff

3   reported being "generally ok" but that he "felt better on Trintellix."  (AR 651, 676.)  In June 2019,

4   Plaintiff reported "doing ok" and "functioning at a fair level," but experiencing forgetfulness.  (AR

5   652, 677.)   Dr. Sievert noted a normal mental status examination, and that Plaintiff was

6   "cooperative and polite," "alert and oriented" and "doing well"  (AR 652, 677.)  Plaintiff

7   complained of "feel[ing] badly" and having difficulty with his wife and stepchildren in August

8   2019.  (AR 679.)  Plaintiff's mental status examination results were normal, with coherent and

9   rational thoughts, normal alertness and orientation, and normal cognitive functions.  (AR 679.)  Dr.

10  Sievert noted Plaintiff was "doing well."  (AR 679.)

11  Plaintiff complained of worsening depression in October 2019.  (AR 681.)  Dr. Sievert

12  found Plaintiff's mental status examination results were normal and that he was "doing well," with

13  normal mood, coherent and relevant speech, normal alertness and orientation, and normal cognitive

14  functions.  (AR 681.)  Plaintiff reported ceasing Trintellix, and taking Sertraline and Paroxetine.

15  (AR 681.)  The treatment goals were indicated as "find antidepressant that works" and a referral

16  for transcranial magnetic stimulation.  (AR 681.)

17  In November 2019, Plaintiff presented to Dr. Sievert for a follow up appointment.  (AR

18  683.)  He reported "doing ok," but was concerned he could become more depressed due to recent

19  deaths of his friends.  (AR 683.)  His mental status examination was normal as before and he was

20  noted to be "doing well."  (AR 683.)  Plaintiff reported to Dr. Sievert in December 2019 that he

21  was having "lots of difficulty" and did "not feel that he is able to do much."  (AR 684, 685.)  Dr.

22  Sievert noted a normal mental status examination, including normal mood, normal alertness and

23  orientation, and normal cognitive functions, and stated that Plaintiff was "doing well."  (AR 684,

24  685.)

25  **2.    Opinion Evidence**

26  In November 2017, Dr. Montana completed a two-page "Physician's Report on Disability"

27  questionnaire.  (AR 617–18.)  His examination findings were that Plaintiff is "unable to focus and

28  concentrate" and "unable to perform the mental and memory requirements of his job."  (AR 617.)

Dr. Montana listed "cognitive dysfunction" and "anxiety and depression" as diagnoses, and opined that Plaintiff is permanently "substantially incapacitated from performance of the usual duties of the position for their current employer." (AR 618.)   In so opining, Dr. Montana observed Plaintiff is "unable to perform the necessary evaluations, data collection, and analysis and application to his job duties." (AR 618.)

Following his examination of Plaintiff, Dr. Swanson opined in March 2018 that Plaintiff

> is judged able to maintain concentration and relate appropriately to others in a job setting. He would be able to handle funds in his own best interests. He is expected to understand, carry out, and remember simple instructions. He is judged able to respond appropriately to usual work situations, such as attendance, safety, and the like. Changes in routine would not be very problematic for him. There do not appear to be substantial restrictions in daily activities. Difficulties in maintaining social relationships do not appear to be present.

(AR 519.)

In September 2018, Dr. Sievert completed the same "Physician's Report on Disability" questionnaire as completed by Dr. Montana. (AR 540–41.) Plaintiff's examination findings were noted to be "poor memory" and "forgetfulness." (AR 540.) Dr. Sievert diagnosed Plaintiff with obsessive compulsive disorder, as evidenced by "muscle tension," "anxiety," and "repetitive statements." Plaintiff was also assessed with generalized anxiety, as he exhibited "tension" and "worry," and was "unable to tolerate stress." (AR 540.) Dr. Sievert concluded that "memory loss precludes work," resulting in Plaintiff's permanent incapacity "from the performance of the usual duties of the position for their current employer." (AR 541.)

Dr. Sievert completed another questionnaire in February 2020, titled "Medical Source Statement of Ability to do Work-Related Activities (Mental)." (AR 686–88.) He found that Plaintiff had "moderate" limitations in his ability to understand, remember, and carry out simple instructions and his ability to make judgments on simple work-related decisions. (AR 686.) Dr. Sievert opined that Plaintiff had "extreme" limitation in his ability to understand, remember, and carry out complex instructions, and his ability to make judgments on complex work-related decisions, due to his becoming "easily confused" with "poor memory." (AR 686.) He also noted moderate limitations in Plaintiff's ability to interact appropriately with supervisor(s) and

coworkers, and extreme limitation in his ability to respond appropriately to usual work situations and to changes in a routine work setting, all due to Plaintiff's "anxiety" and "poor memory." (AR 687.)

That same month, Dr. Schuyler completed the same questionnaire as Dr. Sievert. (AR 690–91.) He found that Plaintiff had "marked" limitations in his ability to understand and remember simple instructions; his ability to understand, remember, and carry out complex instructions; and his ability to make judgments on complex work-related decisions, due to "neuropsychological testing that showed significant problems with memory and executive functions in 2017 that have reportedly grown worse, consistent with frontotemporal dementia." (AR 690.)

**B.     Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on March 22, 2018, and again on reconsideration on May 14, 2018. (AR 116–26.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 133–47.) The ALJ conducted a hearing on March 6, 2020. (AR 37–68.) Plaintiff appeared at the hearing with his attorney and testified as to his alleged disabling conditions. (AR 42–59, 65–68.) A Vocational Expert ("VE") also testified at the hearing. (AR 59–64.)

**C.     The ALJ's Decision**

In a decision dated April 13, 2020, the ALJ found that Plaintiff was not disabled, as defined by the Act. (AR 15–31.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 404.1520. (AR 17–31.) The ALJ decided that Plaintiff had not engaged in substantial gainful activity since October 11, 2017, the amended alleged onset date (step one). (AR 17.) At step two, the ALJ found Plaintiff's following impairments to be severe: "degenerative disc disease; a personality disorder; and substance abuse." (AR 17–18.) Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three). (AR 18–21.)

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[4] and applied the

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P

assessment at steps four and five. *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three

to step four, we assess your residual functional capacity . . . . We use this residual functional

capacity assessment at both step four and step five when we evaluate your claim at these steps.").

The ALJ determined that Plaintiff had the RFC:

> to perform medium work as defined in 20 CFR [§] 404.1567(c) except [Plaintiff]
> can frequently bend, stoop, kneel, crouch, and crawl. He can frequently climb
> ramps and stairs, but cannot climb ladders, ropes, or scaffolds. [Plaintiff] can
> frequently reach overhead with his bilateral upper extremities. He is limited to
> simple and routine tasks meaning that he is not capable of complex judgment or
> analysis in the workplace (due to the side effects of pain and medication), and he
> can have frequent contact with supervisors, coworkers, and the public. He can
> occasionally perform production rate tasks, and adapt to changes in the workplace,
> if they are simple and routine.

(AR 22–28.) Although the ALJ recognized that Plaintiff's impairments "could reasonably be

expected to cause the alleged symptoms[,]" they rejected Plaintiff's subjective testimony as "not

entirely consistent with the medical evidence and other evidence in the record for the reasons

explained in this decision." (AR 23.)

The ALJ determined that Plaintiff could not perform his past work (step four) but that, given

his RFC, he retained the capacity to perform a significant number of other jobs in the local and

national economies (step five). (AR 29–30.) In making this determination, the ALJ posed a series

of hypothetical questions to the VE based upon Plaintiff's RFC. (AR 60–65.) In response, the VE

testified that a person with the specified RFC could perform occupations such as automobile

detailer and courtesy clerk. (AR 61–62, 64–65.) Ultimately, the ALJ concluded that Plaintiff was

not disabled from October 11, 2017, through the date of their decision. (AR 31.)

Plaintiff sought review of this decision before the Appeals Council, which denied review

on October 14, 2020. (AR 1–6.) Therefore, the ALJ's decision became the final decision of the

Commissioner. 20 C.F.R. § 404.981.

---

(S.S.A. July 2, 1996). The RFC assessment considers only functional limitations and restrictions that result from an
individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's
RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and
'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"
*Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

# III.      LEGAL STANDARD

## A.      Applicable Law

An individual is considered "disabled" for purposes of disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  However, "[a]n individual shall be determined to be under a disability only if [their] physical or mental impairment or impairments are of such severity that [they] are not only unable to do [their] previous work but cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920. The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments.  If not, the claimant is not disabled.  If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1.  If so, the claimant is automatically presumed disabled.  If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing [their] past relevant work.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy.  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 416.920(a)(4) (providing the "five-step sequential evaluation process" for SSI claimants).  "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir.

10

1989)).  "However, if a claimant establishes an inability to continue [their] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.    Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner.") (citations omitted).

In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)).  "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir.

1    1993)).

2          Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless."

3    *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*,

4    454 F.3d 1050, 1055–56 (9th Cir. 2006)).   Harmless error "exists when it is clear from the record

5    that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'"

6    *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (quoting *Robbins v. Soc. Sec. Admin.*,

7    466 F.3d 880, 885 (9th Cir. 2006)).   "[T]he burden of showing that an error is harmful normally

8    falls upon the party attacking the agency's determination."  *Shinseki v. Sanders*, 556 U.S. 396, 409

9    (2009) (citations omitted).

10                              **IV.       DISCUSSION**

11         Plaintiff contends that the ALJ committed harmful error in failing to consider his

12   "neurocognitive impairment" severe at step two by "cherry-picking" evidence unfavorable to him.

13   (*See* Doc. 17 at 6–10; Doc. 21 at 1–4.)  The Court disagrees.

14   **A.      Legal Standard**

15         At step two of the sequential evaluation, the ALJ determines which of Plaintiff's alleged

16   impairments are "severe" within the meaning of 20 C.F.R. § 404.1520(c).   A severe impairment is

17   one that "significantly limits" a claimant's "physical or mental ability to do basic work activities."

18   *Id*.    An ALJ must consider all the evidence at step two to determine whether a medically

19   determinable impairment significantly limits the claimant's ability to perform basic work activities.

20   *Id.* §§ 404.1520(a), 416.920(a); *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987).   "An impairment or

21   combination of impairments may be found 'not severe only if the evidence establishes a slight

22   abnormality that has no more than a minimal effect on an individual's ability to work.'"   *Webb v.

23   Barnhart*, 433 F.3d 683, 686–87 (9th Cir. 2005) (quoting Social Security Ruling ("SSR") 96–3p

24   (1996)).   The purpose of step two is to operate as "a de minimis screening device to dispose of

25   groundless claims."   *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996); *see also Hoopai v.

26   Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007) (the step two finding is "merely a threshold

27   determination" that "only raises a prima facie case of a disability."); *Buck v. Berryhill*, 869 F.3d

28   1040, 1048–49 (9th Cir. 2017) ("Step two is merely a threshold determination meant to screen out

weak claims.  It is not meant to identify the impairments that should be taken into account when determining the RFC.") (internal citations omitted).  The plaintiff bears the burden of proof at step two to show that an impairment qualifies as severe.  *Bowen*, 482 U.S. at 146 n.5.

**B.      The ALJ Did Not Err at Step Two**

        In support of argument that the ALJ erred at step two by failing to deem Plaintiff's neurocognitive impairment severe, Plaintiff relies on the limitations opined by consultative examiners Drs. Sievert, Montana, and Schuyler.[5]  (*See* Doc. 17 at 6–10; Doc. 21 at 1–4.)

**1.      Medical Opinion Evidence Generally**

        Plaintiff's claim is governed by the agency's "new" regulations concerning how ALJs must evaluate medical opinions for claims filed on or after March 27, 2017.  20 C.F.R. § 404.1520c.  The regulations set "supportability" and "consistency" as "the most important factors" when determining the opinions' persuasiveness.  20 C.F.R. § 404.1520c(b)(2).  Although the regulations eliminate the "physician hierarchy," deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [they] considered the medical opinions" and "how persuasive [they] find all of the medical opinions."  20 C.F.R. § 404.1520c(a)–(b).

        Recently, the Ninth Circuit issued the following guidance regarding treatment of physicians' opinions after implementation of the revised regulations:

> The revised social security regulations are clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant.  *See* 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from your medical sources.").  Our requirement that ALJs provide "specific and legitimate reasons" for rejecting a treating or examining doctor's opinion, which stems from the special weight given to such opinions, *see Murray*, 722 F.2d at 501–02, is likewise incompatible with the revised regulations.  Insisting that ALJs provide a more robust explanation when discrediting evidence from certain sources necessarily favors the evidence from those sources—contrary to the revised regulations.

*Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).  Under the new regulations, "the decision to discredit any medical opinion, must simply be supported by substantial evidence."  *Id*. at 787.

---

[5] Plaintiff also relies on his subjective complaints to establish limitations in his cognitive functioning (*see* Doc. 17 at 7, 10), but these complaints were discredited by the ALJ, a finding Plaintiff does not challenge.

In conjunction with this requirement, "[t]he agency must 'articulate . . . how persuasive' it finds 'all of the medical opinions' from each doctor or other source, 20 C.F.R. § 404.1520c(b), and 'explain how [it] considered the supportability and consistency factors' in reaching these findings, *id*. § 404.1520c(b)(2)." *Woods*, 32 F.4th at 792. "Supportability means the extent to which a medical source supports the medical opinion by explaining the 'relevant . . . objective medical evidence.'" *Id*. at 791–92 (quoting 20 C.F.R. § 404.1520c(c)(1)) "Consistency means the extent to which a medical opinion is 'consistent . . . with the evidence from other medical sources and nonmedical sources in the claim.'" *Id*. at 792 (quoting 20 C.F.R. § 404.1520c(c)(2)).

As the Ninth Circuit also observed,

> The revised regulations recognize that a medical source's relationship with the claimant is still relevant when assessing the persuasiveness of the source's opinion. *See id.* § 404.1520c(c)(3). Thus, an ALJ can still consider the length and purpose of the treatment relationship, the frequency of examinations, the kinds and extent of examinations that the medical source has performed or ordered from specialists, and whether the medical source has examined the claimant or merely reviewed the claimant's records. *Id.* § 404.1520c(c)(3)(i)–(v). However, the ALJ no longer needs to make specific findings regarding these relationship factors:

*Woods*, 32 F.4th at 792. "A discussion of relationship factors may be appropriate when 'two or more medical opinions . . . about the same issue are . . . equally well-supported . . . and consistent with the record . . . but are not exactly the same.'" *Id.* (quoting § 404.1520c(b)(3)). "In that case, the ALJ 'will articulate how [the agency] considered the other most persuasive factors.'" *Id.* Lastly, if the medical opinion includes evidence on an issue reserved to the Commissioner, the ALJ need not provide an analysis of the evidence in his decision, even in the discussions required by 20 C.F.R. § 404.1520c. *See* 20 C.F.R. §§ 404.1520b(c)(3).

With these legal standards in mind, the Court reviews the weight given to Drs. Sievert's, Montana's, and Schuyler's opinions.

**2.    Analysis**

a.    Dr. Sievert

In finding Dr. Sievert's September 2018 opinion related to Plaintiff's mental functioning "not persuasive," the ALJ reasoned as follows:

This opinion is on an ultimate issue of the case, and is reserved to the Commissioner.

14

1

> Further, Dr. Sievert minimally supports his opinion, including only a vague statement that "memory loss preludes work" (Ex. 15F, 2). This is not consistent with the examination of the consultative examiner and the independent medical examiner. Specifically, the claimant's' normal intelligence and memory testing during the consultative examination, and Dr. Bronshvags' conclusion that there was no evidence of dementia, lobe issues, and no documented or demonstrated structural brain disease (Ex. 15F, 19).

2

3

4

5

6

(AR 27.) As to Dr. Sievert's February 2020 opinion, the ALJ deemed it "not persuasive" because it is

7

8

9

> grossly inconsistent with the evidence. Specifically, it is inconsistent with the claimant's normal intelligence and memory testing during the consultative examination, inconsistent with imaging of his brain with no acute findings, and inconsistent with the opinion of the independent medical examiner that there was no evidence of dementia or structural brain disease (Ex. 3F, 2, 8; 9F; 15F, 19).

10

11

12

13

> Dr. Sievert's opinion is also not supported by his own treatment notes, where the claimant was chronicled with normal cognitive functioning throughout 2018 and 2019 (Ex. 5F, 1-3; 19F, 1; 20F). Additionally, his opinion is inconsistent with evidence that the claimant remains active with a "dune buggy" club, and evidence that the claimant's memory symptoms may be secondary to his history of benzodiazepine dependency (Ex. 5F, 3; 9F, 3).

14

(AR 27–28.)

15

16

17

18

19

20

21

As an initial matter, Dr. Sievert's conclusion in September 2018 that Plaintiff's "memory loss" renders him permanently incapacitated "from the performance of the usual duties of the position for their current employer" (AR 541) does not assess any specific work-related function, and does not constitute a "medical opinion" under 20 C.F.R. § 404.1513(a)(2). The ALJ was therefore not required to articulate how persuasive he considered the evidence to be, or to otherwise address Dr. Sievert's disability determination in the written decision. *See* 20 C.F.R. § 404.1520b(c)(3)(i).

22

23

24

25

26

27

28

Nevertheless, the ALJ did evaluate the supportability and consistency of <u>both</u> of Dr. Sievert's opinions, and did so properly. As to supportability, the ALJ appropriately considered Dr. Sievert's failure to adequately explain his reasoning for his September 2018 opinion. *See* 20 C.F.R. § 404.1520c(c)(1) (requiring the ALJ to consider "supporting explanations presented by a medical source."). As the ALJ observed, Dr. Sievert's September 2018 opinion was cursory in nature, stating only that "memory loss precludes work." (AR 27, 541) The lack of supporting explanation was a proper consideration in evaluating the supportability of Dr. Sievert's September 2018

opinion.  *See* 20 C.F.R. § 404.1520c(c)(1); *Woods*, 32 F.4th at 794 (substantial evidence supported finding that medical opinion, expressed in a "fill-in-the-blank questionnaire," was "not persuasive because it is not supported by any explanation" or "pertinent exam findings."); *Ponce v. Comm'r of Soc. Sec.*, No. 1:20-CV-01664-EPG, 2022 WL 196529, at \*3 (E.D. Cal. Jan. 21, 2022) (declining to find the ALJ erroneously rejected medical opinion where given on a "checkbox form with no significant narrative explanation" and "no citation to record evidence.").

        The ALJ determined Dr. Sievert's February 2020 opinion concerning Plaintiff's "extreme" mental limitations was not supported by his own treatment notes and objective findings.  For example, as cited by the ALJ, Dr. Sievert routinely found Plaintiff exhibited "normal cognitive functions" throughout 2018 and 2019, including during a visit that took place two months before rendering his opinion.  (*See* AR 528, 653 (April 2018); AR 648, 670 (November 2018); AR 649, 672 (February 2019); AR 650, 674 (March 2019); AR 651, 676 (May 2019); AR 652, 677 (June 2019); AR 679 (August 2019); AR 681 (October 681); AR 683 (November 2019); and AR 684, 685 (December 2019).)  As the ALJ observed elsewhere in the opinion, Dr. Sievert consistently documented Plaintiff's status as "doing well" throughout this time period.  (*See id*.)  The lack of support by Dr. Sievert's own treatment notes and objective findings was a proper consideration in evaluating the supportability of his opinion.  *See, e.g., Trezona v. Comm'r of Soc. Sec.,* No. 1:21-CV-00792-EPG, 2022 WL 1693493, at \*3 (E.D. Cal. May 26, 2022); *Amanda B. v. Comm'r, Soc. Sec. Admin*., No. 1:20-CV-01507-YY, 2022 WL 972408, at \*7 (D. Or. Mar. 31, 2022).

        As to consistency, the ALJ found Dr. Sievert's opinions concerning Plaintiff's mental limitations was generally inconsistent with the other medical evidence.  As cited by the ALJ, Plaintiff had average scores on both intelligence and memory tests performed by Dr. Swanson in March 2018.  (AR 516–18.)  In addition, Dr. Bronshvag's review in that same month of Plaintiff's medical records and MRI testing found no evidence of any structural brain disease, atrophy, shrinkage, seizures, or dementia.  (AR 558.)

                b.      Dr. Montana

        The Court finds that the ALJ also properly evaluated the supportability and consistency of

1  Dr. Montana's opinion.[6]  Finding the opinion "not persuasive," the ALJ correctly observed that it

2  is "the same 'check box' form that Dr. Sievert submitted" and found it "likewise inconsistent with

3  the noted medical references above, as well as being flatly contradicted by [Plaintiff's] admitted

4  vigorous activities of daily living."  (AR 27.)  Dr. Montana does not explain how "psychological

5  testing" results support Plaintiff's inability to "perform the mental and memory requirements of his

6  job," particularly given that no such testing was performed on July 24, 2017, the date specified.

7  (*See* AR 617.  *See also* AR 590–92.)  This opinion is also undermined by Dr. Montana's own

8  treatment notes from the prior month, where he noted his mental examination of Plaintiff was

9  normal, with normal mood, affect, and behavior.  (AR 352, 377.)

10      The ALJ also reasonably found the opinion inconsistent with Plaintiff's average

11  performance on intelligence and memory tests in March 2018 (AR 516–18) and lack of objective

12  evidence of any structural brain disease, atrophy, shrinkage, seizures, or dementia (AR 558), as

13  discussed above, as well as Plaintiff's "vigorous" activities of daily living that post-date the

14  opinion, which include participation in a "dune buggy" club, riding dune buggies and dirt-bikes,

15  boating, camping, and going to the beach.  (AR 515.)  *See, e.g., Zalomski v. Comm'r of Soc. Sec.*

16  *Admin.*, No. CV-21-00417-PHX-MTL, 2022 WL 2816809, at *3 (D. Ariz. July 19, 2022) (ALJ

17  properly found medical opinion inconsistent with Plaintiff's activities of daily living).  *See also* 20

18  C.F.R. § 404.1520c(c)(2).

19          c.    Dr. Schuyler

20      Finally, the ALJ evaluated Dr. Schuyler's opinion as follows:

21      This opinion is also not persuasive.  Dr. Schuyler does cite the 2017 testing which
22      showed some problems with verbal memory, which does somewhat support his
        opinion (Ex. 15F, 12).  However, he also cites [Plaintiff's] symptoms as being
23      "consistent with frontotemporal dementia," but, as discussed at length above, there
        is no evidence of "frontotemporal dementia" in the record.  Further, his opinion is
24      inconsistent with [Plaintiff's] normal intelligence and memory testing during the
        consultative examination, inconsistent with imaging of his brain, and inconsistent
25      with opinion of the independent medical examiner, that there was no evidence of
26      dementia or structural brain disease (Ex. 3F, 2, 8; 9F; 15F, 19).  His opinion is further

27  _____

28  [6] Like Dr. Sievert's, Dr. Montana's opinion that Plaintiff is permanently "substantially incapacitated from performance of the usual duties of the position for their current employer" (AR 618) is a determination reserved to the Commissioner, for which the ALJ was not required to provide any analysis.  *See* 20 C.F.R. § 404.1520b(c)(3)(i).

1
2
3

inconsistent with Dr. Sievert's treatment notes, where the claimant was chronicled with normal cognitive functioning throughout 2018 and 2019 (Ex. 5F, 1-3; 19F, 1; 20F).  Additionally, his opinion is inconsistent with evidence that the claimant remains active with a "dune buggy" club, and evidence that the claimant's memory symptoms may be secondary to his history of benzodiazepine dependency.

4
5
6
7
8
9
10
11

(AR 28.)  The Court concludes that the ALJ properly evaluated the supportability and consistency of Dr. Schuyler's opinion.  As to supportability, the ALJ appropriately found Plaintiff's October 2017 testing, while showing some difficulties with verbal memory (*see* AR 551), was an insufficient basis from which to find "marked" limitations in Plaintiff's ability to understand, remember, and carry out instructions.  (*See* AR 690.)  As support for his opinion, Dr. Schuyler states that Plaintiff's "problems with memory and executive functions" have "reportedly grown worse," but identifies no evidence in the record to substantiate such "reports," leaving one to conclude that it is based on Plaintiff's own subjective reporting (which the ALJ discredited).

12
13
14
15
16
17
18

Dr. Schuyler's finding that Plaintiff's condition was worsening and "consistent with frontotemporal dementia" is also inconsistent with the medical evidence during the relevant period.  As detailed above, Plaintiff consistently exhibited "normal cognitive functions" during mental status examinations and had average scores on both intelligence and memory tests.  Both treatment records and objective (MRI) testing demonstrated no evidence of any structural brain disease, atrophy, shrinkage, seizures, or dementia.  The ALJ also correctly observed that Plaintiff's daily activities, described above, further undermine Dr. Schuyler's conclusions.

19
20
21
22
23
24
25
26
27

Plaintiff is correct that the ALJ must not "cherry-pick" instances of no or low symptomology without considering the context, such as instances of high symptomology.  *See Reddick v. Chater*, 157 F.3d 715, 722-23 (9th Cir. 1998) (an ALJ must not "cherry-pick" certain observations without considering their context); *see also Attmore v. Colvin*, 827 F.3d 872, 875 (9th Cir. 2016) (quoting *Tackett*, 180 F.3d at 1098) (the Court "cannot affirm . . . 'simply by isolating a specific quantum of supporting evidence,' but 'must consider the record as a whole, weighing both evidence that supports and evidence that detracts').  The Court does not however concur with Plaintiff that the ALJ committed this error.  To the contrary, the Court finds Plaintiff's invitation to focus on records that support his "severe neurocognitive impairments," without mentioning the

28

normal findings therein, the very definition of prohibited cherry-picking.  (*See* Doc. 17 at 10 (citing AR 333, 339, 351, 365, 369, 376, 481, 640, 642, 646, 651, 652, 654, 658, 662, 668, 676, 677).) The Court declines, as doing so is incongruous with the intent of the Social Security Act.  *See e.g., White v. Comm'r Soc. Sec.*, 572 F.3d 272, 285 (6th Cir. 2009) ("The problem with [plaintiff's] cherry picking argument, however, is that it cuts both ways. She too cherry picks data.").

In sum, while the medical record reflects that Plaintiff has "moderate mental health limitations" (*see* AR 26), it was reasonable for the ALJ to conclude that the record did not support the severity of the restrictions opined by Drs. Sievert, Montana, and Schuyler.  That these opinions lacked support and were inconsistent with the medical evidence were legally sufficient findings based on substantial evidence.  The fact that Plaintiff's course of treatment could be interpreted differently has no effect on this Court's ruling.  *See Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995) ("The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. We must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.") (citations omitted).  *See also Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, [the Court] must defer to the ALJ's conclusion.").  Thus, the ALJ did not err by finding the opinions of Drs. Sievert, Montana, and Schuyler not persuasive.

**C.   Even Assuming *Arguendo* the ALJ Did Err, Such Error was Harmless**

Even had the ALJ erred by failing to conclude, based on Drs. Sievert's, Montana's, and/or Schuler's opinions, that Plaintiff had a severe neurocognitive impairment, the Court agrees with the Commissioner that such error was at most harmless.  A claimant is prejudiced at step two by an ALJ's omission of an impairment only where that step is not resolved in the claimant's favor. *See Burch*, 400 F.3d at 682 ("Here, the ALJ did not find that Burch's obesity was a 'severe' impairment . . . . Assuming without deciding that this omission constituted legal error, it could only have prejudiced Burch in step three (listing impairment determination) or step five (RFC) because the other steps, including this one, were resolved in her favor."); *see also Hickman v. Comm'r*, 399 F. App'x 300, 302 (9th Cir. 2010) ("Any error in the ALJ's failure to include a reading disorder as

1    one of Hickman's severe impairments at step two of the analysis is harmless. The ALJ found

2    Hickman suffered from other severe impairments and, thus, step two was already resolved in

3    Hickman's favor.").  Additionally, the failure to include an impairment in the step two analysis is

4    harmless if the ALJ considers the functional limitations that flow from said impairment in

5    subsequent steps. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (holding that ALJ's failure

6    to list plaintiff's bursitis as a severe impairment at step two was harmless where ALJ considered

7    limitations caused by the condition at step four); *see also Molina*, 674 F.3d at 1115 (error is

8    harmless "where it is inconsequential to the [ALJ's] ultimate nondisability determination").

9         Step two was resolved in Plaintiff's favor when the ALJ determined that his severe

10   impairments included degenerative disc disease, a personality disorder, and substance abuse; the

11   ALJ then proceeded to the step three analysis.  (AR 17–18.).  It follows that, since Plaintiff's claims

12   were not screened out at this step, he was not prejudiced by any error in the step two analysis.  The

13   ALJ went on to state in her RFC findings that they "considered all symptoms and the extent to

14   which these symptoms can reasonably be accepted as consistent with the objective medical

15   evidence . . . ." (AR 22; *see, e.g., Sara Ann W. v. Comm'r of Soc. Sec.*, No. 2:17-CV-00277-RHW,

16   2018 WL 4088771, at *4 (E.D. Wash. Aug. 27, 2018) ("[T]he ALJ specifically noted that she

17   considered all symptoms in assessing the residual functional capacity.  Accordingly, the Court finds

18   the ALJ did not err in the step two analysis, and if any error did occur it was harmless.").)  In fact,

19   the ALJ's evaluation of Drs. Sievert's, Montana's, and Schuyler's opinions took place <u>after</u> step

20   two, in the context of assessing Plaintiff's RFC at step four.  (*See* AR 27–28.)

21        Plaintiff does not address the Commissioner's harmlessness argument.  (*See* Doc. 20 at 18–

22   19.)  Nor does he identify any evidence, other than the above-described medical opinions and his

23   unchallenged discredited complaints, demonstrating that his neurocognitive impairments caused

24   alleged limitations that were not accounted for in his RFC.  The Court finds that the ALJ properly

25   weighed the medical evidence, the opinion evidence, and Plaintiff's symptom claims and, as a

26   result, the RFC incorporated the "moderate mental health limitations" that were supported by

27   substantial evidence in the record (*see* AR 26), like his problems with verbal memory (*see* AR

28   551).  This includes Plaintiff's limitations to "simple and routine tasks," in that he is "not capable

of complex judgment or analysis in the workplace," and occasional performance of production rate tasks and adaptation to changes in the workplace, so long as they are "simple and routine." (AR 22.)

## V.      CONCLUSION AND ORDER

After consideration of Plaintiff's and the Commissioner's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Kilolo Kijakazi, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:   **August 29, 2022**                        /s/ *Sheila K. Oberto*
                                                   UNITED STATES MAGISTRATE JUDGE